Argued and submitted November 5, 1997; resubmitted June 11, 1998, decision of
Court of Appeals affirmed; judgment of circuit court affirmed in part and reversed
in part and case remanded to circuit court for further proceedings July 15, 1999
See 329 Or 369 for opinion on petitioner's motion for clarification

John LAKIN
and Ann Marie Lakin,
husband and wife,
*Respondents on Review,*
*v.*
SENCO PRODUCTS, INC.,
an Ohio corporation,
*Petitioner on Review,*
*and*
WESTERN SUPPLY CORPORATION,
an Oregon Corporation,
dba Western Tool Supply,
*Defendant.*
(CC 9211-07901; CA A83575; SC S44110)
987 P2d 463

Ridgway K. Foley, Jr., of Green & Markley, P.C., Portland, argued the cause for petitioner on review. With him on the briefs was M. Elizabeth Duncan.

Kathryn H. Clarke, Portland, argued the cause for respondents on review. With her on the briefs was Maureen Leonard, Portland.

Mark A. Bonanno and Thomas E. Cooney, of Cooney & Crew, P.C., Portland, filed a brief on behalf of *amicus curiae* Oregon Medical Association.

Jeffrey M. Batchelor, of Lane Powell Spears Lubersky LLP, Portland, filed briefs on behalf of *amicus curiae* Oregon Association of Defense Counsel.

Thomas W. Brown, of Cosgrave, Vergeer & Kester, LLP, Portland, Steven J. Goode, Austin, Texas, William Powers, Jr., Austin, Texas, and Hugh F. Young, Jr., of the Product Liability Advisory Council, Inc., Reston, Virginia, filed a brief on behalf of *amicus curiae* Product Liability Advisory Council, Inc.

Thomas M. Christ, of Mitchell, Lang & Smith, Portland, filed a brief on behalf of *amicus curiae* Mutual of Enumclaw Insurance Company.

Jonathan M. Hoffman, of Martin, Bischoff, Templeton, Langslet & Hoffman, Portland, filed a brief on behalf of *amici curiae* Toyota Motor Corporation, Toyota Motor Sales U.S.A., Inc., and Broadway Toyota, Inc.

Daniel J. Popeo and David M. Young, of Washington Legal Foundation, Washington, D.C., and R. Daniel Lindahl, of Bullivant Houser Bailey Pendergrass & Hoffman, P.C., Portland, filed a brief on behalf of *amici curiae* Washington Legal Foundation and Allied Educational Foundation.

Charles S. Tauman, Portland, filed a brief on behalf of *amici curiae* Oregon State Council of Senior Citizens, United Seniors of Oregon, Salem Gray Panthers, Portland Gray Panthers, Oregon Consumer League, Consumer Justice Alliance, Oregon Action, Oregon Advocacy Center, Oregon State Public Interest Research, Oregon Law Center, Brain Injury Support Group of Oregon, Brain Injury Association of Oregon, Oregon Coalition Against Domestic and Sexual Violence, and United Cerebral Palsy of Oregon.

Robert K. Udziela, of Pozzi Wilson Atchison, LLP, Portland, David F. Sugerman, of Paul & Sugerman, P.C., and Douglas G. Schaller, of Johnson, Clifton, Larson & Corson P.C., filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Arthur C. Johnson, Eugene, filed a brief on behalf of *amicus curiae* Association of Trial Lawyers of America.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.**

VAN HOOMISSEN, J.

** Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision; Leeson, J., did not participate in the consideration or the decision of this case.

## VAN HOOMISSEN, J.

John Lakin and Ann Marie Lakin, (plaintiffs), brought an action at law against defendant Senco Products, Inc., (Senco) seeking economic, noneconomic, and punitive damages for personal injury and loss of consortium arising out of allegations of negligent failure to warn and strict products liability in the design and manufacture of the SN325 pneumatic nail gun. In its answer, Senco alleged, *inter alia*, that ORS 18.560(1)[1] limited any noneconomic damage award to $500,000. The jury returned a special verdict finding Senco liable both in strict liability and in negligence, and fixing John Lakin's comparative fault at five percent. The jury awarded John Lakin $3,323,413 in economic damages and $2,000,000 in noneconomic damages, and awarded Ann Marie Lakin $876,000 in noneconomic damages for loss of consortium. The jury also found that Senco had acted with "wanton disregard for the health, safety and welfare of others" in causing plaintiffs' injuries, and awarded $4,000,000 in

---

[1] ORS 18.560 provides:

"(1) Except for claims subject to ORS 30.260 to 30.300 [the Oregon Tort Claims Act] and ORS chapter 656 [the Oregon Workers' Compensation Act], in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000.

"(2) As used in this section:

"(a) 'Economic damages' means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or replacement of damaged property, whichever is less.

"(b) 'Noneconomic damages' means subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment.

"(3) This section does not apply to punitive damages.

"(4) The jury shall not be advised of the limitation set forth in this section."

punitive damages. The trial court applied ORS 18.560(1) and entered judgment for each plaintiff for $500,000 in noneconomic damages, reduced by the jury's finding that John Lakin had contributed five percent to his injuries. Plaintiffs and Senco both appealed.

On Senco's appeal, the Court of Appeals affirmed. On plaintiffs' cross-appeal, the court affirmed in part and reversed in part. Adhering to its earlier holding in *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 873 P2d 413 (1994), *rev dismissed* 321 Or 561, 901 P2d 859 (1995), the court held that ORS 18.560(1) violates Article VII (Amended), section 3, of the Oregon Constitution,[2] by mandating an unconstitutional "re-examination" of a fact tried by a jury. *Lakin v. Senco Products, Inc.*, 144 Or App 52, 925 P2d 107 (1996). We allowed Senco's petition for review. The primary issue on review is the constitutionality of ORS 18.560(1). For the reasons that follow, we hold that ORS 18.560(1) violates Article I, section 17, of the Oregon Constitution.[3] We affirm the Court of Appeals' decision.

We summarize the facts from the Court of Appeals' opinion. Defendant Senco manufactures and markets pneumatic nail guns, including the SN325, which discharges 3.25 inch nails. In 1990, plaintiff John Lakin used an SN325 gun to place a single nail into a piece of wood. Standing on his toes on a makeshift sawhorse platform, Lakin raised the wood and the SN325 over his head, pressed the firing end of the SN325 against the wood, and activated the trigger. Instead of discharging only a single nail, the SN325 immediately thereafter discharged a second nail, which struck part of the first nail, causing the firing end of the SN325 to recoil into Lakin's face. The SN325 then discharged a third nail, which penetrated Lakin's brain. As a result of his injuries, parts of Lakin's brain had to be surgically removed. He now suffers

---

[2] Article VII (Amended), section 3, provides, in part:

"In actions at law, * * * the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say that there is no evidence to support the verdict."

[3] Article I, section 17, provides:

"In all civil cases the right of Trial by Jury shall remain inviolate."

from diminished mental and emotional capacities, his left arm and leg are paralyzed, he has undergone a radical personality change, and he cannot live independently. As noted, the jury awarded both plaintiffs noneconomic damages in excess of the limits provided by ORS 18.560(1). The trial court reduced the jury's awards according to a formula that the trial court thought to be required by that statute.

As pertinent on appeal, Senco challenged the trial court's evidentiary rulings, its jury instructions, and its denial of a directed verdict, all of which pertained to Senco's compensatory liability. Senco also challenged the trial court's rulings pertaining to punitive damages. Senco renews those arguments on review. Plaintiffs' cross-appeal contended that ORS 18.560(1) violates several provisions of the Oregon and United States Constitutions. On Senco's appeal, the Court of Appeals affirmed; on plaintiffs' cross-appeal, the court reversed and remanded for entry of a judgment modifying John Lakin's recovery of noneconomic damages and Ann Marie Lakin's recovery for loss of consortium, and otherwise affirmed. We allowed Senco's petition for review primarily to consider the constitutionality of ORS 18.560(1), which caps noneconomic damages in this case.

## I. OREGON CONSTITUTION

In addressing the constitutionality of ORS 18.560(1) under the Oregon Constitution, this court's concern is whether the legislature had the power to enact that statute. Although, as noted, the Court of Appeals decided this issue on the basis of Article VII (Amended), section 3, of the Oregon Constitution, we believe that the answer to whether the challenged statute violates the right to jury trial expressed in Article I, section 17, of the Oregon Constitution, is dispositive.

In analyzing the meaning of a provision of the Oregon Constitution, this court looks to the specific wording of the provision, the case law surrounding it, and the historical circumstances that led to its enactment. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). We begin with the text of Article I, section 17.

## A.  *Text*

■        Article I, section 17, provides:

> "In all civil cases the right of Trial by Jury shall remain inviolate."

No party questions that this is a civil case or that plaintiffs had a right to a jury trial for their claims. No party argues that "inviolate" has a different meaning today than it did when Article I, section 17, was adopted in 1857 as part of the original Oregon Constitution. Thus, for purposes of this case, whatever the right to a jury trial in a civil case meant in 1857, it has the same meaning today.

In 1828, the word "inviolate" meant "unhurt; uninjured; unprofaned, unpolluted; unbroken." Noah Webster, *American Dictionary of the English Language*, Vol 1, p 113 (1828). Although it post-dates adoption of Article I, section 17, in 1889 "inviolate" meant "not violated; free from violation or hurt of any kind; secure against violation or impairment." *The Century Dictionary*, Vol III, p 3174 (1889). The plain wording of Article I, section 17, does not answer the question whether the right to a jury trial then meant, and, therefore, now means, that the legislature may not adopt a statute imposing a cap on the amount of noneconomic damages recoverable in a civil case. We proceed to examine Oregon cases that have construed Article I, section 17.

## B.  *Case law*

■■        In *Molodyh v. Truck Insurance Exchange*, 304 Or 290, 295, 744 P2d 992 (1987), this court stated that Article I, section 17, guarantees a jury trial "in those classes of cases in which the right was customary at the time the [Oregon] constitution was adopted or in cases of like nature." The court further stated that the right to jury trial under Article I, section 17,

> "includes having a jury determine all issues of fact, not just those issues that remain after the legislature has narrowed the claims process."

*Id.* at 297-98. *See also State v. 1920 Studebaker Touring Car*, 120 Or 254, 259, 251 P 701 (1927) ("The right of trial by jury guaranteed by the Constitution of this state, embraces every

case where it existed before the adoption of the Constitution, and it is not within the power of the legislature to enact any law which deprives any litigant of that right."); *Tribou v. Strowbridge*, 7 Or 157, 159 (1879) (Article I, section 17, "indicates that the right of trial by jury shall continue to all suitors in courts in all cases in which it was secured to them by the laws and practice of the courts at the time of the adoption of the constitution.").

## C. *History*

■ The guarantee of trial by jury was ensured in the Magna Carta in 1215, although the historical origins of the jury system predate the Magna Carta by hundreds of years. Thomas H. Tongue, *In Defense of Juries as Exclusive Judges of the Facts*, 35 Or L Rev 143, 145 (1956) (citing 3 Blackstone *Commentaries* 349-50). *See also* James L. Coke, *On Jury Trial*, 1 Or L Rev 177 (1922) (tracing history of jury trial to ancient Athens). From the first British expeditions to America, the common law of England, including jury trial procedures, was made a part of the law of colonial communities);[4] *State v. Hansen*, 304 Or 169, 172, 743 P2d 157 (1987) ("The 'common law of England' was adopted prior to statehood or official territorial status by Oregon's provisional government. * * * The common law, in the sense of an evolving body of law, continues in force insofar as it is not in conflict with legislation or constitutional provisions.").

In *Dimick v. Schiedt*, 293 US 474, 485-86, 55 S Ct 296, 79 L Ed 603 (1935), the United States Supreme Court explained:

"The right of trial by jury is of ancient origin, characterized by Blackstone as 'the glory of the English law' and 'the

---

[4] In 1774, the First Continental Congress declared that the people of America were "entitled to the common law of England," especially the right to trial by jury, the denial of which explicitly was incorporated in the Declaration of Independence as one of the King's acts of tyranny. In 1787, Congress passed a law protecting the right of jury trial in the North-West Territory:

"The inhabitants of said territory shall always be entitled to the benefits of * * * trial by jury; * * * and of judicial proceedings according to the course of the common law."

Article of Compact contained in the Ordinance of 1787 for the Government of the North-West Territory (reprinted in General Laws of Oregon, p 81 (Deady 1845-1864)).

most transcendent privilege which any subject can enjoy'
(Bk. 3, p 379); and, as Justice Story said (2 Story, Const.
§ 1779), '* * * the Constitution would have been justly
obnoxious to the most conclusive objection if it had not rec-
ognized and confirmed it in the most solemn terms.' With,
perhaps, some exceptions, trial by jury has always been,
and still is, generally regarded as the normal and prefera-
ble mode of disposing of issues of fact in civil cases at law as
well as in criminal cases. Maintenance of the jury as a fact-
finding body is of such importance and occupies so firm a
place in our history and jurisprudence that any seeming
curtailment of the right to a jury trial should be scrutinized
with the utmost care. * * *

"The controlling distinction between the power of the
court and that of the jury is that the former is the power to
determine the law and the latter to determine the facts."

(Citations omitted.)

By 1783, the majority of state constitutions con-
tained a catalogue of civil liberties that uniformly guaranteed
the right to trial by jury in a civil case. Robert F. Williams,
*State Constitutional Law*, 151-53 (2d ed 1993). Those provi-
sions were carried over into the 1802 Ohio Constitution and
the 1816 Indiana Constitution.[5] Article I, section 17, was
taken *verbatim* from Article I, section 20, of the Indiana Con-
stitution of 1851.[6] W. C. Palmer, *The Sources of the Oregon
Constitution*, 5 Or L Rev 200, 201 (1926). Thus, Article I, sec-
tion 17, has its origins in the early American colonial charters
and the first state constitutions.

In 1844, an Oregon legislative act provided, in part:

"All the statute law of Iowa Territory passed at the first
session of the Legislative Assembly of said Territory, and

---

[5] The early constitutions of Kentucky, Ohio, and Tennessee all provided that
the right to jury trial in a civil case shall remain "inviolate." The Pennsylvania Con-
stitution of 1776 provided that the right to trial by jury "ought to be held sacred."
The drafters of Indiana's Bill of Rights borrowed freely from the wording of other
states' constitutions, most notably the constitutions of Kentucky, Ohio, Tennessee,
and Pennsylvania. Robert Twomley, *The Indiana Bill of Rights*, 20 Ind LJ 211, 212-
13 (1945).

[6] Article I, section 20, of the 1851 Indiana Constitution, provides:

"In all civil cases, the right of trial by jury shall remain inviolate."

not of a local character, and not incompatible with the condition and circumstances of this country, shall be the law of this government, unless otherwise modified; and the common law of England and principles of equity, not modified by the statutes of Iowa or of this government, and not incompatible with its principles, shall constitute a part of the law of this land."

Or Laws, Art III, § 1, p 100 (1843-49).[7]

In 1845, the inhabitants of the Oregon Territory adopted the organic law of the provisional government of Oregon. Article I, section 2, of that document provided, in part:

"The inhabitants of said [Oregon] territory shall always be entitled to the benefits of * * * trial by jury, * * * and of judicial proceedings according to the course of the common law."

Organic Law of the Provisional Government of Oregon (reprinted in General Laws of Oregon, p 59 (Deady 1845-1864)).

In 1848, Congress extended the rights protected by the 1787 Northwest Ordinance, including the right to jury trial in a civil case, to the Oregon Territory. *An Act to Establish the Territorial Government of Oregon*, Section 14 (reprinted in General Laws of Oregon, pp 66, 75 (Deady 1845-1865)).

The people of the Oregon Territory approved the Oregon Constitution in 1857; it went into effect February 14, 1859.

From the foregoing, we conclude that the framers of the Oregon Constitution clearly understood the meaning of the right to jury trial in a civil case and that they intended that that right would remain "inviolate," *i.e.*, secure against violation or impairment, in the new State of Oregon. It follows, therefore, that whatever the right to "Trial by Jury" meant in 1857, it means precisely the same thing today. The next question is whether the assessment of damages was a function of a common-law jury in 1857.

---

[7] Article I, section 9, of the 1846 Iowa Constitution, provides, in part:

"The right of trial by jury shall remain inviolate[.]"

■ In actions for injuries not willfully inflicted, compensation is the fundamental principle of the law of damages. *See Oliver v. North Pacific Transportation Co.*, 3 Or 84, 88 (1869) (if entitled to anything, plaintiff "is entitled to such a sum of money as will fully compensate him for all loss and injury to him, caused by the negligence or wrongful act"). The purpose of awarding money for pain and suffering caused by another person is to give "the sufferer a pecuniary satisfaction." 3 W. Blackstone, *Commentaries* 1112. Blackstone also wrote that, if a civil verdict were for the plaintiff, the jurors "assess the damages also sustained by the plaintiff in consequence of the injury upon which the action is brought." *Id.* at 1339. In his treatise on damages, McCormick wrote that:

> "The amount of damages * * * from the beginning of trial by jury, was a 'fact' to be found by the jurors."

Charles T. McCormick, *Handbook on the Law of Damages*, 24 (1935). *See also Molodyh*, 304 Or at 297-98 (the right to jury trial "includes having a jury determine all issues of fact, not just those issues that remain after the legislature has narrowed the claims process"); *1920 Studebaker Touring Car*, 120 Or at 259 ("[I]t is not within the power of the legislature to enact any law which deprives any litigant of [the right of jury trial guaranteed by the Oregon Constitution].").

■ In *Nelson v. Oregon Railway Etc. Co.*, 13 Or 141, 143, 9 P 321 (1886), this court considered the defendant's argument that the trial jury's factual findings did not support the damages awarded. The court stated:

> "The verdict herein may have been much larger than this court would have allowed under the evidence in the case, or in view of the facts found by the jury. Still we have no right to set it aside, or reverse or modify the judgment entered thereon. The jury are judges of the facts, and however widely our view might disagree with theirs matters nothing. We have no right to invade their province, however sanguine we may be that they have committed error."

To the same effect, *see generally Locatelli v. Ramsey*, 223 Or 238, 242, 354 P2d 317 (1960); *Van Lom v. Schneiderman*, 187 Or 89, 111, 210 P2d 461 (1955); *Hall v. Cornett*, 193 Or 634, 644, 240 P2d 231 (1952); *Fehely v. Senders*, 170 Or 457, 474, 135 P2d 283 (1943); *Malpica v. Cannery Supply Co.*, 95 Or

242, 248, 187 P 596 (1920); *Smitson v. Southern Pac. Company*, 37 Or 74, 95, 60 P2d 907 (1900). From the foregoing, we conclude that the assessment of damages was a function of a common-law jury in 1857.[8]

### D. *Judicial control of jury verdicts*

At ancient common law, trial judges had no power to order a new trial solely on the ground that the judge thought that the verdict was "excessive." The power of a common-law trial judge to set aside a jury verdict on account of excessive damages and to order a new trial evolved on account of misbehavior by jurors. 3 W. Blackstone, *Commentaries*, 1347. It was not until *Wood v. Gunston*, 82 Eng Rep 864, 867 (1655), that a judge, without any statutory authority, assumed the power to set aside a jury verdict and grant a new trial for the reason that, in the opinion of the trial judge, the amount of the verdict was "excessive." Before that case, it appears that the only ground for a new trial was actual "misconduct of the jury." Tongue, 35 Or L Rev at 145-46 (citing 1 Holdsworth, *A History of English Law*, 225 (3d ed 1922)). In *Van Lom*, 187 Or at 111-12, this court stated:

> "In ancient times, as is recounted in 1 Holdsworth's History of English Law (3d ed.) 337-347, when a jury brought in what seemed to be a false verdict the court examined by means of an attaint jury whether it was correct. If the original jury was convicted by the attaint jury they were imprisoned for a year, forfeited their goods, became infamous,

---

[8] Although the Seventh Amendment to the United States Constitution does not apply through the Fourteenth Amendment to the states, *Minneapolis & St. Louis R.R. v. Bombolis*, 241 US 211, 217, 36 S Ct 595, 60 L Ed 961 (1916); *Walker v. Sauvinet*, 92 US 90, 23 L Ed 678 (1875), we read the decisions of the United States Supreme Court to have reached the same conclusion under the Seventh Amendment. *See Dimick*, 293 US at 480 (the common-law rule as it existed at the time of the adoption of the United States Constitution was "that in cases where the amount of damages was uncertain[,] their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it") (citations omitted); *see also Feltner v. Columbia Pictures Television, Inc.*, 523 US 340, 353, 118 S Ct 1279, 1287, 140 L Ed 2d 438 (1998) ("there is historical evidence that cases involving discretionary monetary relief were tried before juries," and "[i]t has long been recognized that 'by the law the jury are judges of the damages' " (quoting *Townsend v. Hughes*, 86 Eng Rep 994, 994-95 (C.P. 1677)) and that "there is overwhelming evidence that the consistent practice at common law was for juries to award damages"); *Hetzel v. Prince William County*, 523 US 208, 211, 118 S Ct 1210, 1212, 140 L Ed 2d 336 (1998) (imposition of a *remittitur* without the option of a new trial "cannot be squared with the Seventh Amendment").

their wives and children were turned out, and their lands laid waste. * * * The barbarity of this practice finally led to its abandonment. But 'It was obvious', says Holdsworth (p. 346) 'that some regular method of controlling the verdicts of juries was essential to the proper working of the jury system. This regular method of control was found in the growth of the practice of granting new trials if the verdict was clearly contrary to the weight of evidence.' And, again, he says in speaking of the value of the jury system as it developed in England, 'the jury would never have won this popularity, it would never have attained these results, if it had not been controlled by the action of the courts, the legislature and the Council.' (p. 321)."

This court's early cases indicate that the court took seriously the principle that juries were to be the exclusive judges of a party's damages. Before 1910, with respect to motions for nonsuit or directed verdict, the sole question was whether there was "any" evidence in favor of the plaintiff and, if there was, the jury must receive the case. *Tippin v. Ward*, 5 Or 450, 453 (1875) (the case should be submitted to jury, unless an entire lack of evidence tending to maintain issues on behalf of the plaintiff or, unless upon the whole case made by the plaintiff, it appears beyond doubt that the plaintiff has no right to recover); *Vanbebber v. Plunkett*, 26 Or 562, 564-65, 38 P 707 (1895) (if evidence offered to prove a fact is "competent, and its tendency, however slight, is to prove such fact, the jury ought to have it, as they are the exclusive judges of its sufficiency"). Moreover, this court discouraged the practice of setting aside a jury's verdict solely on the ground that the trial judge thought the verdict was "excessive." *See Ore. Cas. R.R. v. Ore. S. Nav. Co.*, 3 Or 178, 179 (1869) (a verdict that is subject to no other objection should not be set aside because the judge may differ from the jury as to the preponderance of evidence).

In *Serles v. Serles*, 35 Or 289, 57 P 634 (1899), however, this court interpreted Oregon law to mandate judicial review that weighed the evidence and could set aside a jury's verdict and order a new trial, even if the verdict was supported by sufficient evidence to submit the case to the jury and was rendered after a trial without legal error. Even after *Serles*, however, no Oregon trial court could enter a judgment for an amount less than the jury's verdict without giving the

prevailing party the option of a new jury trial. In 1910, Oregon voters eliminated Oregon trial courts' power to grant new trials for excessive verdicts by adopting Article VII (Amended), section 3, (prohibiting any "fact tried by a jury" from being "re-examined in any court unless no evidence supports the verdict").

In the face of the foregoing line of authority, punctuated by the adoption of Article VII (Amended), section 3, in 1910, Senco relies on *dicta* in *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995), to support its contention that ORS 18.560(1) does not violate Article I, section 17. In *Greist*, this court stated:

> "When Article I, section 17, and the [Oregon] constitution were adopted, a jury's determination of the amount of damages to be awarded in tort actions was not protected from judicial alteration.
>
> "\* \* \* \* \*
>
> "*Until* the adoption of Article VII (Amended), section 3, in 1910, trial courts were empowered to reduce jury awards of damages when the courts believed that those awards were excessive. That fact, in itself, disposes of plaintiff's argument that there existed at common law, at the time Article I, section 17, was adopted in 1857, a right to have a judge enter judgment on a jury's award of damages—without judicial alterations—in a personal injury action."

322 Or at 294-95 (emphasis in original). Based on that *dicta*, Senco argues:

> "From the beginning, the Oregon legislature also possessed the power to authorize courts to set aside excessive verdicts, \* \* \* limit the amount of recoverable damages in certain actions \* \* \*, and govern the procedure for awarding damages, \* \* \* without compromising the right of trial by jury."

Senco asserts that *Greist* "should end the inquiry for the present case."

The quoted *dicta* requires correction. Oregon trial courts never have had the power to reduce a jury's verdict or to enter judgment for a lesser amount of damages over the objection of the prevailing party, who always could reject a judicial *remittitur* and demand a new jury trial. *See Adcock v.*

*Oregon Railroad Co.*, 45 Or 173, 181, 77 P 78 (1904) (in an action for personal injuries, the court may order a remission of part of the damages awarded by the jury, but only as a condition of overruling a motion for a new trial).

In *Greist*, this court held that there is no right to a jury trial in a wrongful death action, because a wrongful death claim was not one recognized at common law or under the Oregon Territorial Law when Article I, section 17, was adopted. *Greist*, 322 Or at 294-95. However, *Greist*, did not resolve the constitutionality of ORS 18.560(1) as applied to a statutory limit on recovery of noneconomic damages in a common-law action such as this for which, until recently, no statutory limitation on noneconomic damages had existed. We agree with plaintiffs that these common-law actions carry with them fundamental rights to a jury determination of the right to receive, and the amount of, damages. Thus, because of the common-law origins of plaintiffs' claims here, *Greist* is distinguishable.

E. *Senco's arguments*

Senco argues that because, at common law, the trial judge had authority to ask the plaintiff to accept a *remittitur* of damages thought to be excessive or not supported by the evidence or to face a new trial, the legislature has the right to do the same thing by imposing a cap on noneconomic damages. We disagree. A statutory cap fundamentally is different from the doctrine of judicial *remittitur*. First, the legislative cap is mandatory, not discretionary. The legislature obviously has not "asked" plaintiffs to accept less than the jury's verdict; it has mandated a reduction. Moreover, a trial judge's power before 1857 to grant a new trial differs in several important respects from the legislature's power to cap damages. Most important, the trial judge determined the excessiveness of the damages, if any, or the insufficiency of the evidence to support the award by reviewing the facts in a specific case. Then, if the judge decided that the jury had rendered an improper damages verdict, the prevailing party had the right to have a second jury decide damages. Under the cap, plaintiffs are denied a second jury trial.

Additionally, the statutory cap is not contingent on a factual finding that the award is excessive as a matter of law.

The reduction is mandated even though the jury is correctly instructed, its findings are supported by the evidence as a matter of law, and no legal error is present in the record. The statutory cap involves no review of the facts of a specific case. Moreover, the statutory cap also denies a prevailing party an opportunity to accept a *remittitur* of the jury's award of non-economic damages that is less than the jury's award, but that exceeds the statutory cap.

■■ ■■ Senco cites no authority, and we are aware of none, for the proposition that the drafters of Article I, section 17, would have tolerated interference with a jury's award of noneconomic damages in a case such as this as long as the interference originated in the legislature and not in the court. Senco's focus on the legislature's power is misdirected. The proper focus under Article I, section 17, is on the rights of the litigants and the proper role of the jury in a civil case. Here, the broad powers of the legislature must yield to a litigant's specific right to a "Trial by Jury" guaranteed in Article I, section 17, as that right was understood in 1857. We conclude that Article I, section 17, prohibits the legislature from interfering with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857, or in cases of like nature.

■■ Senco also argues that, because under Article XVIII, section 7, of the Oregon Constitution,[9] the legislature has the power to alter or repeal "all laws," it must have the power to define the legal boundaries of those laws, including the extent to which a civil defendant may be liable for noneconomic damages. Again, we disagree. That provision reserves in the people of Oregon the right to alter all "laws" in force in the Oregon Territory in 1857, whether the same were of common law or legislative origin. *See Perozzi v. Ganiere*, 149 Or 330, 346, 40 P2d 1009 (1935) (sanctioning legislative limitation on guest passengers' right to sue for gross and intentional, but not ordinary, negligence). However, the legislature's power to alter "laws" in force in 1857 may be exercised only to the

---

[9] Article XVIII, section 7, provides:

"All laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered or repealed."

extent that it does not infringe on constitutionally protected rights. If Article I, section 17, guarantees the right to have a jury assess noneconomic damages in cases to which it applies, then the legislature may not interfere with that right by capping those damages.

Senco next argues that, because ORS 18.560(1) is a law that is applied only *after* the jury has performed its fact-finding function, it does not violate Article I, section 17. Senco argues that the jury's fact-finding function "ends with its ascertainment of the facts, assessment of the damages, and return of the verdict." At that point, Senco asserts, a judicial function arises, *i.e.*, the duty to apply the law to the facts. "Remedies are matters of law, not matters of fact," Senco insists. Senco concludes that ORS 18.560(1) "does nothing to impair that trial or that verdict." That argument was persuasive in *Etheridge v. Medical Centers Hospitals*, 376 SE 2d 525, 528-29 (Va 1989),[10] but was rejected in *Sofie v. Fiberboard Corp.*, 771 P2d 711, 724 (Wash 1989).

Although it is true that ORS 18.560(1) does not prohibit a jury from assessing noneconomic damages, to the extent that the jury's award exceeds the statutory cap, the statute prevents the jury's award from having its full and intended effect. We conclude that to permit the legislature to override the effect of the jury's determination of noneconomic damages would "violate" plaintiffs' right to "Trial by Jury," guaranteed in Article I, section 17. Limiting the effect of a jury's noneconomic damages verdict eviscerates "Trial by Jury" as it was understood in 1857 and, therefore, does not allow the common-law right of jury trial to remain "inviolate." We agree with the reasoning of the Washington Supreme Court in *Sofie* that an argument like that advanced by Senco here

"ignores the constitutional magnitude of the jury's fact-finding province, including its role to determine damages.

---

[10] We note that the relevant provisions of the present Virginia Constitution, like the Virginia Declaration of Rights (1776), is written in terms of admonition, not legal command. Article I, section 11, of the Virginia Constitution, provides, in part:

"That in * * * suits between man and man, trial by jury is preferable to any other, and ought to be held sacred."

[To argue *contra* is to assert] that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment. Such an argument pays lip service to the form of the jury but robs the institution of its function. This court will not construe constitutional rights in such a manner. As we once stated: " 'The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.... If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding.' "

771 P2d at 721.

Senco also argues that ORS 18.560(1) is valid because, even after the cap is applied, plaintiffs "received a large verdict," including "substantial" noneconomic damages. In *Hale v. Port of Portland*, 308 Or 508, 523, 783 P2d 506 (1989), this court held that Article I, section 10, of the Oregon Constitution,[11] is not violated when the legislature alters, or even abolishes, a cause of action, so long as the injured party is not left entirely without a remedy:

"[T]he remedy need not be precisely of the same type or extent; it is enough that the remedy is a substantial one."

The issue in *Hale* was whether the damage limitations in the Oregon Tort Claims Act, ORS 30.260 *et seq.*, were constitutional as applied to cities and port districts. This court held that those limitations did not deny the plaintiff a right of action against the City of Portland guaranteed by Article I, section 10, of the Oregon Constitution, and that the damage limitations were permissible under Article I, section 20.[12] *Id.* at 517-26. The court further held that the

---

[11] Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

[12] Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

damage limitations did not violate the Due Process or Equal Protection Clauses to the United States Constitution. *Id.* at 526-27. We do not find *Hale's* Article I, sections 10 and 20, analyses relevant to our analysis of Article I, section 17. This court's Article I, section 17, jurisprudence never has established a "substantial" remedy test in defining the scope and meaning of the right of jury trial. Moreover, we do not assess the constitutionality of ORS 18.560(1) under Article I, section 17, based on the amount of the statutory cap; rather, we assess its constitutionality *because it is a cap* on the jury's determination of noneconomic damages.

From the foregoing, we conclude that ORS 18.560(1) interferes with the resolution of a factual issue, *i.e.*, noneconomic damages, that Article I, section 17, commits to the jury. Thus, the statute's requirement that "the amount awarded * * * shall not exceed $500,000" violates the injured party's right to receive an award that reflects the jury's factual determination of the amount of the damages "as will fully compensate [plaintiffs] for all loss and injury to [them]." *Oliver*, 3 Or at 87-88. For the reasons explained above, we hold that ORS 18.560(1) violates Article I, section 17, of the Oregon Constitution, and, thus, is void with respect to cases to which the constitutional provision applies.

We acknowledge that other courts have upheld statutory caps on noneconomic damages on various theories under their own state constitutions.[13] We have reviewed the extensive decisional law from other jurisdictions on this subject and we are satisfied that the conclusion that we reach today is supported by the better-reasoned authorities. In addition to the decision of the Washington Supreme Court in *Sofie*, quoted above, see *Moore v. Mobile Infirmary Ass'n*, 592

---

[13] The constitutionality of state statutory damage caps has been attacked in state and federal courts on several grounds. It has been asserted, *inter alia*, that such caps violate constitutional guarantees of trial by jury, equal privileges and immunities, separation of powers, substantive and procedural due process, equal protection, remedy by due course of law, access to courts, and against special legislation. The courts that have considered the constitutionality of state caps are divided on theory, analysis, and outcome. It does not appear that the United States Supreme Court has addressed the issue of the validity of state statutory caps on noneconomic damages under the Seventh Amendment. *See* Jennifer Friesen, *State Constitutional Law*, § 6-3, 354-71 (2d ed) (1992 w/supp 1997) (citing and discussing cases).

So 2d 156, 163 (Ala 1991) (damages assessments of Alabama juries are protected by constitutional guarantee of right to trial by jury); *Condemarin v. University Hosp.*, 775 P2d 348, 365-66 (Utah 1989) (plurality opinion) (striking balance in favor of constitutional right of jury trial); *Arneson v. Olson*, 270 NW2d 125, 137 (ND 1978) (Medical Malpractice Act violated jury trial provision of state constitution). In contrast, see *Johnson v. St. Vincent Hosp.*, 404 NE2d 585, 601-02 (Ind 1980) (medical malpractice cap does not violate right of trial by jury).

■ ■ In summary, Article I, section 17, guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature. *Molodyh.* In any such case, the trial of all issues of fact must be by jury. The determination of damages in a personal injury case is a question of fact. *Chase v. Alexander*, 255 Or 136, 138, 465 P2d 226 (1970); *Van Lom*, 187 Or at 126-27 (Brand, J., concurring in part and dissenting in part). The damages available in a personal injury action include compensation for noneconomic damages resulting from the injury. *Smitson; Fehely.* The legislature may not interfere with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857, or in cases of like nature. *Molodyh*, 304 Or at 297-98; *1902 Studebaker Touring Car*, 120 Or at 259. It follows, therefore, that, in this context, ORS 18.560(1) violates Article I, section 17.

## II. PUNITIVE DAMAGES

We proceed to consider Senco's arguments relating to punitive damages. Senco challenges plaintiffs' entitlement to punitive damages as well as the alleged "excessiveness" of the jury's punitive damages award. Senco argues that the jury's $4,000,000 million punitive damages award violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which provides:

> "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"

Senco argues that "[n]either this Court on independent review, nor any rational juror, could find, by clear and convincing evidence or otherwise, that Senco acted with wanton

disregard on the plain record in this case." Therefore, Senco asserts, the trial court erred in submitting the issue of punitive damages to the jury, and the Court of Appeals erred in affirming the trial court's ruling on that issue. Senco asserts that the Court of Appeals "neglected its duty" meaningfully to review the punitive damages award, as it was required to do by *Honda Motor Co., Ltd. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994), *on remand Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8 (1995), and *BMW of North America v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996).

■ In *Oberg*, 320 Or at 549, this court stated:

"[T]he standard for post-verdict judicial review of an award of punitive damages is as follows: A jury's award of punitive damages shall not be disturbed when it is within the range that a rational juror would be entitled to award in the light of the record as a whole; the range that a rational juror would be entitled to award depends, in turn, on the statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue."[14]

(Footnote omitted.)

Following our independent review of the record and for the reasons cogently explained in the Court of Appeals' opinion, *Lakin*, 144 Or App at 67-74, we conclude that the

---

[11] ORS 30.925(2) defines the statutory factors to be considered in assessing punitive damages in a product liability case:

"(2) Punitive damages, if any, shall be determined and awarded based upon the following criteria:

"(a) The likelihood at the time that serious harm would arise from the defendant's misconduct;

"(b) The degree of the defendant's awareness of that likelihood;

"(c) The profitability of the defendant's misconduct;

"(d) The duration of the defendant's misconduct and any concealment of it;

"(e) The attitude and conduct of the defendant upon discovery of the misconduct;

"(f) The financial condition of the defendant; and

"(g) The total deterrent effect of other punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's and the severity of criminal penalties to which the defendant has been or may be subjected."

trial court did not err in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict on the issue of entitlement to punitive damages. We hold that on this record as a whole a rational juror would be entitled to award *some* amount of punitive damages.

■ We also have considered Senco's challenge to the alleged excessiveness of the jury's punitive damages award.[15] The Court of Appeals concluded that the punitive damages award was "within the range that a rational juror would be entitled to award." *Id.* at 76 (quoting *Oberg*, 320 Or at 544). Following our independent review of the entire record, and on consideration of *Oberg*'s directive and the factors enumerated in ORS 30.925(2), we conclude that a rational juror would be entitled to award the amount of punitive damages that this jury awarded to plaintiffs. The Court of Appeals' summary of the evidence that the jury could have found to be established by clear and convincing evidence, *Lakin*, 144 Or App at 76-77, supports our conclusion. The award of punitive damages was not unconstitutionally excessive.

■■ We also have considered Senco's challenges to the trial court's admission of the testimony of Senco's general counsel, who testified that he was aware that claims were made "four to eight times per year" involving the unintended actuation of Senco's nail guns, and to the admission of the testimony of plaintiffs' expert witness, who testified that he had knowledge of prior accidents occurring as a result of the use of Senco's nail guns. Both witnesses' testimony was offered to show that Senco had notice of the dangerousness of the SN325. For the reasons explained by the Court of Appeals, *id.* at 61-63, we find no error and, therefore, affirm the trial court's rulings on those issues.

Finally, we have considered each of Senco's other assignments of error and every argument made thereunder. As to any assignment or argument not discussed above, we find no error.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed

---

[15] Senco does not challenge the constitutional sufficiency of Oregon's procedures for assessing and reviewing punitive damage awards.

in part, and the case is remanded to the circuit court for further proceedings.